FILED
United States Court of Appeals
Tenth Circuit

May 6, 2019

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

MEDICAL DIAGNOSTIC
LABORATORIES, LLC,

      Plaintiff - Appellant,

v.

HEALTH CARE SERVICE
CORPORATION, a Mutual Legal Reserve
Company d/b/a BLUE CROSS BLUE
SHIELD OF OKLAHOMA,

      Defendant - Appellee.

No. 17-6189
(D.C. No. 5:16-CV-00902-D)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **MORITZ**, **MURPHY**, and **EID**, Circuit Judges

---

Plaintiff-Appellant Medical Diagnostic Laboratories, LLC (MDL) sued Blue

Cross Blue Shield of Oklahoma (Blue Cross), an unincorporated division of Health Care

Service Corporation (HCSC), in diversity, asserting state law tort claims for tortious

interference with prospective economic advantage and defamation, and seeking

injunctive relief.  The district court granted Blue Cross's motion to dismiss the case under

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. MDL appealed the dismissal of the complaint, asserting that the allegations were sufficient to survive a motion to dismiss. We agree with the district court and now affirm.

I.

MDL is a New Jersey limited liability company whose principal place of business is located in New Jersey. Compl. ¶¶ 6–7. HCSC (which does business as Blue Cross Blue Shield) is an Illinois corporation whose principal place of business is in Illinois. *Id.* ¶ 8. MDL provides diagnostic laboratory testing services, specializing in unique, patented and patent-pending testing services for gynecological diseases. *Id.* ¶ 11.

HCSC administers "health care insurance plans across the country." *Id.* ¶ 19. Each HCSC division "maintains a 'network' of healthcare providers with which [it] has contracts generally known as 'provider agreements.'" *Id.* ¶ 22. After "a healthcare provider enters into a 'provider agreement . . . the provider becomes what is known colloquially as 'in-network.'" *Id.* ¶ 23. "In-network" providers allow HCSC's divisions to pay discounted rates for services provided to patients who have HCSC insurance plans. *Id.* ¶ 24. Blue Cross is the company's Oklahoma division. *Id.* ¶ 21-22.

MDL alleged that providers have incentives to enter into provider agreements because HCSC "control[s] significant portions of the healthcare market" in the regions in which it operates and "is able to direct significant amounts of business to providers that are 'in-network.'" *Id.* ¶ 25. MDL alleged that Blue Cross "controls approximately 61% of the private health care market in Oklahoma." *Id.* ¶ 26.

Blue Cross has two in-network laboratories in Oklahoma: Diagnostic Laboratory of Oklahoma (DLO) and Regional Medical Laboratory Inc. (RML). *Id.* ¶ 27. As alleged by MDL, neither of these in-network laboratories offers the "unique, patented, and proprietary testing that MDL offers," making their testing services less effective and more expensive than those offered by MDL. *Id.* ¶ 28.

MDL attached to its complaint approximately fifty letters from in-network Blue Cross member-providers to Blue Cross recommending that MDL become an in-network provider. *Id.* ¶ 29. Those letters stated that MDL offers unique clinical laboratory testing that assists the medical provider in making diagnoses of certain gynecological diseases. Blue Cross has taken no action to make MDL an in-network laboratory service provider in Oklahoma, although MDL alleged it is currently an in-network provider with HCSC in its Illinois and Texas divisions. *Id.* ¶ 31.

Blue Cross sent a letter to the member-providers in response to their provider letters of recommendation (the Response Letter). The Response Letter first notes that Blue Cross "periodically reviews out-of-network utilization." Aplt. App. at 20. Then the letter refers specifically to the letters of recommendation: "According to your correspondence, you are currently or are considering utilizing Medical Diagnostic Laboratory which is an out-of-network laboratory." *Id.* The letter goes on to state that DLO and RML, Blue Cross's in-network laboratories, "are able to provide the specific services outlined in [the recommendation] letter." *Id.* The letter then reproduces the text from Article II, Section 2.8 of the provider BlueChoice PPO contract. *Id.* at 21. Further,

3

the letter requests that member-providers abide by the BlueChoice PPO contract, specifically that, pursuant to Article II, Section 2.8:

> Physician is required to refer his or her BlueChoice PPO Network Members to other BlueChoice PPO Network Participating Providers when such individuals require services that cannot be provided by Physician. In the event that Physician finds that the services of an out-of-network provider are required in order to provide the services needed by his or her BlueChoice PPO Network Member, arrangements for the services of an out-of-network provider can be obtained in the same manner as Preauthorization described in section below. Any specialty referrals for BlueChoice PPO Network Members participating in the Point of Service Program must be obtained from the BlueChoice PPO Network Member's Primary Care Physician.

*Id.* at 20. Finally, the letter states that if the provider continues to refer the provider's patients to out-of-network laboratories, "[Blue Cross] may choose to proceed with termination of [the member-provider's] contracts." *Id.* at 21.

In response to the letter, MDL wrote to Blue Cross demanding that it cease and desist intimidating member-providers who requested consideration for MDL to become an in-network provider. Compl. ¶ 41. MDL also alleged that at least one of the providers who wrote a recommendation letter to Blue Cross was twice contacted by telephone after receiving the letter. *Id.* ¶ 42. In the calls, HCSC told the provider to stop sending testing specimens to MDL or face possible termination of their Blue Cross provider agreement. *Id.*

MDL then filed suit, alleging that Blue Cross tortiously interfered with prospective economic advantage by causing providers and patients not to enter into or to discontinue relationships with MDL, and/or preventing MDL from acquiring prospective relations. *Id.* ¶ 60. MDL further alleged that Blue Cross defamed MDL to its in-network member-

4

providers by issuing the letter. *Id.* ¶ 64–65. MDL alleged that since the letter it has lost physician referrals. *Id.* ¶ 72.

Blue Cross filed a motion to dismiss MDL's complaint, contending that MDL had failed to state a plausible claim for relief because (1) MDL did not plead the required elements of a tortious interference claim; (2) MDL did not identify any actionable statements by Blue Cross to support its defamation claim; and (3) MDL's request for injunctive relief is unconstitutionally broad and vague and would restrict Blue Cross's freedom of speech. Aplt. App. at 29–45.

The district court granted Blue Cross's motion to dismiss, holding that the complaint failed to state a claim upon which relief could be granted. *Id.* at 147. The district court offered MDL an opportunity to amend its complaint. MDL chose to file an appeal rather than amend its complaint. Aplt. Br. at 15 n.3.

II.

We review the grant of a Rule 12(b)(6) motion to dismiss de novo applying the same legal standard used by the district court. *Teigen v. Renfrow*, 511 F. 3d 1072, 1078 (10th Cir. 2007). All well-pleaded facts, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to the nonmoving party. *Id.* Documents attached to the complaint are considered as part of the pleadings. *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The allegations in the complaint "must be enough to raise a right to relief above the

5

speculative level." *Twombly*, 550 U.S. at 545. A complaint containing merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient.[1] *Id.*

A.

Under Oklahoma law, to state a claim for tortious interference with prospective economic advantage,

> the plaintiff must show: (1) the existence of a valid business relation or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) an intentional interference including or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted.

*Cohlmia v. St. John Medical Center*, 693 F.3d 1269, 1286–87 (10th Cir. 2012). "In order to prevail, the plaintiff must show that the defendant used 'some intentional or improper conduct or means.'" *Id.* at 1287 (quoting *Overbeck v. Quaker Life Ins. Co.*, 757 P.2d 846, 848 (Okla. Civ. App. 1984)). Because MDL cannot show that Blue Cross used "some intentional or improper conduct or means" in sending the Response Letter, it has failed to state a claim for tortious interference with prospective economic advantage.

Oklahoma law holds that an actor's course of conduct is privileged if its "primary focus" was protection of the actor's legitimate economic interests rather than interference. *Green Bay Packaging, Inc. v. Preferred Packaging, Inc.*, 932 P.2d 1091, 1096 (Okla. 1996) (applying *Morrow Dev. Corp. v. Am. Bank & Trust Co.*, 875 P.2d 411,

---

[1] "Because this is a diversity case, we rely on the substantive law of Oklahoma and apply federal procedural law." *Ahrens v. Ford Motor Co.*, 340 F.3d 1142, 1145 (10th Cir. 2003) (quotations omitted).

416 (Okla. 1994)). And, although this privilege is not absolute and can be lost when the underlying motive is to harm another,[2] asserting contractual rights—as was done here— does not amount to tortious interference. *See id.* Here, the Response Letter reiterates the provisions of the contract that require a member-provider to obtain preauthorization before referring a patient to an out-of-network provider. The Response Letter states that

> [i]n the event that Physician finds that the services of an out-of-network provider are required in order to provide the services needed by his or her BlueChoice PPO Network Member, arrangements for the services of an out-of-network provider can be obtained in the same manner as Preauthorization described in section below.

Aplt. App. at 21. The letter also states that if the member-providers refer a member to out-of-network providers, Blue Cross "may proceed" to terminate the member-providers contract with Blue Cross. *Id.*

The Response Letter states that Blue Cross will consider terminating a member-provider as an in-network provider if that provider continues to refer patients to out-of-network laboratories such as MDL without prior authorization. MDL agrees with this reading of the letter. Compl. ¶ 37 ("The [Response Letter] threaten[s] to terminate the providers' 'in network' state with [Blue Cross] if the physician[s] continue[s] to refer samples to MDL without prior authorization"). But the fact that Blue Cross was simply reiterating the contractual provisions that allow out-of-network referrals only with preauthorization is fatal to MDL's claim. The act of enforcing contractual obligations is not actionable under Oklahoma law.

---

[2] MDL makes no claim that Blue Cross lost the contractual privilege under Oklahoma law.

7

MDL asserts that the Response Letter goes beyond the assertion of contractual rights because the letter can be read to suggest that it will never grant preauthorization or that preauthorization requests are futile. We agree with the district court, however, that nothing in the letter suggests that member-providers are precluded from using MDL if they go through the proper preauthorization procedure, or if their patients consent to paying for MDL's testing services without requesting insurance reimbursement. Nor is there a suggestion in the letter that preauthorization requests will be automatically denied. On the contrary, the Response Letter recites the preauthorization procedures. Moreover, MDL's own complaint alleges that its tests are unique, and that Blue Cross is obligated to defer to the judgment of its providers regarding medically necessary services. Compl. ¶¶ 11, 51. The letter expressly states that providers must go through the preauthorization procedures if they are to use MDL. We decline MDL's invitation to find a hidden meaning that contradicts the express language of the letter.

In sum, the Response Letter reiterated the contractual obligation that providers seek preauthorization before using out-of-network companies such as MDL. Such an assertion of a contractual obligation is not actionable under the law of Oklahoma for tortious interference. Accordingly, we conclude that the district court properly dismissed MDL's claim for tortious interference.[3]

B.

---

[3] MDL asks this court to consider *Medical Diagnostic Laboratories, LLC v. Independence Blue Cross*, No. CV 16-5855, 2017 WL 3776619 (E.D. Pa. Aug. 30, 2017). In that case, unlike here, there were allegations of withheld payments and existing contractual relationships. We therefore find the case inapposite.

We turn next to MDL's claim that the Response Letter was defamatory. "Under Oklahoma law, 'a communication is defamatory if it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Payne v. WS Services, LLC*, 216 F. Supp. 3d 1304, 1320 (W.D. Okla. 2016) (quoting *Wilson v. City of Tulsa*, 91 P.3d 673, 680 (Okla. Civ. App. 2004)) (brackets omitted). The district court found that MDL's complaint did not plausibly allege a defamatory statement because Blue Cross's statement that other laboratories can provide the specific services as outlined in the member-provider's letter did not lower the estimation of MDL in the community or deter others from associating with MDL. *See* Aplt. App. at 146. We agree.

MDL contends that if we take as true the allegation that "MDL offers unique proprietary tests not performed by either DLO, RML, or for that matter, any clinical laboratory in the Blue Cross network," then the statement in the Response Letter that Blue Cross "has verified that our In-Network Laboratories are able to provide the specific services as outlined in your letter" is defamatory. *See* Compl. ¶ 46; Aplt. App. at 12. More specifically, MDL contends that by stating that in-network providers can provide the "specific services" offered by MDL, the letter suggests that MDL testing is not "unique," which in turn caused medical providers to stop using MDL's services. But an analysis of the letter defeats this understanding.

First, the Response Letter states that the in-network labs can provide the "specific services" as outlined in the member-provider letter. The Response Letter does not suggest, contrary to MDL's argument, that the in-network labs provide the exact "same"

9

services as MDL. The Response Letter simply states that the in-network labs can provide the "specific" category of tests that MDL provides, but it does not say that the tests are identical. This distinction, albeit small, is an important one, as there is nothing in the Response Letter to suggest that the MDL tests are not unique. Indeed, the Response Letter goes further by stating that the "each of [Blue Cross's] preferred labs" are available to "discuss [the member-provider's] specific testing needs." *Id.* Accordingly, MDL has not sufficiently pleaded the first element of a claim for defamation—the existence of a defamatory statement—and we proceed no further. *See Payne*, 216 F. Supp. 3d at 1320.

Our conclusion is the same whether we consider this a case of defamation per se, where the statement is defamatory on its face, *see Miskovsky v. Tulsa Tribune Co.*, 678 P.2d 242, 248–49 (Okla. 1983), or defamation per quod, where the plaintiff must "plead the meaning the words have and that they would be understood to have . . . ." *Id.* (citation omitted). In other words, we reach the same result whether we look just to the text of the Response Letter, or to the surrounding allegation that MDL testing is unique. In both instances, MDL must adequately plead the existence of a defamatory statement, which we find is lacking here.

MDL also alleges that the Response Letter caused it to suffer significant damages in lost business and that, again, its allegation of a causal connection between the Response Letter and its lost business must be taken as true at this stage. For the same reason, however, this argument fails. The question is not whether MDL suffered

damages, but whether it has properly alleged that a defamatory statement caused those damages. Again, such an allegation is lacking in this case.

At most, the Response Letter attempts to shore up the reputation of the testing services offered by in-network labs by explaining that they provide the specific services outlined in the member-provider's letters. Aplt. App. at 20. Pumping up the in-network providers does not denigrate or degrade MDL. Accordingly, we conclude that dismissal of MDL's defamation claim was warranted.

C.

To state a claim for injunctive relief, the requesting party has the burden to show: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1180 (10th Cir. 2003) (citations omitted). Given our conclusion that MDL has failed to state a claim for either tortious interference or defamation, we affirm the district court's denial of injunctive relief.

D.

Finally, MDL requests that this court remand the case to allow it to amend its complaint. MDL did not file an amended complaint in the district court, and instead appealed to this court. Aplt. Br. at 15 n.3. Without the benefit of an amended complaint at the district court, we are left with no hint as to MDL's possible amendments and are thus left to speculate. Accordingly, we deny MDL's request to amend its complaint.

11

III.

For the reasons stated above, we affirm the judgment of the district court.

Entered for the Court


Allison H. Eid
Circuit Judge